## Case No. 3,784.

### DEN v. HILL et al.

[1 McAll. 480.] [1]

Circuit Court, California.[2] Jan. Term, 1859.

ACTS OF PUBLIC OFFICERS — PRESUMPTION OF AUTHORITY — GRANTS OF MEXICAN GOVERNORS OF CALIFORNIA.

1. The public acts of public officers, purporting to have been done in an official capacity, shall not be presumed to be usurped, but that a legitimate authority had been previously conferred, or subsequently ratified.

2. The reasons which gave application to this rule arose out of the powers of the Spanish monarch, and his relations with his vice-regents in the New World, and do not apply to the territorial or departmental governors of California.

3. Their granting powers must be exercised in conformity with the colonization decree of Mexico, of 1824, and the regulations of 1828.

4. No presumption in favor of the validity of their acts arises, to the extent to which that rule has been carried in the cases of Spanish titles.

This cause was left to be determined by the court, on the law and facts, without the intervention of a jury.

James McDougal and Isaac Hartman, for plaintiffs.

Thompson, Irving & Pate and Eugene Lies, for defendants.

McALLISTER, Circuit Judge. This is an action brought[?] for the recovery of damages for the detention and conversion of certain live stock, and other personal property. The damages are laid at $50,000. A jury has been waived, and the cause left by consent of parties, on the law and facts, to the court.

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

[1] [Reported by Cutler McAllister, Esq.]

[2] [District not given.]

It appears that defendants, as the highest bidders at public outcry, became on the 4th December, 1845, the lessees for the term of nine years, of the mission of Santa Barbara, together with the live stock and personal property; which arrangement was made in conformity with the decree of the 25th May, 1845, and the regulations of 28th October, in the same year. At the expiration of the lease, the plaintiff claimed to be the owner of the personal property, and demanded possession of a portion of it. The defendants refused to recognize the ownership of plaintiff; whereupon he brought this suit. To sustain his title, he produced a paper purporting to be made on the 10th June, 1846, by Pio Pico, constitutional governor, and which professes to convey the reversionary interest of Mexico to the mission of Santa Barbara, after the expiration of the lease, with all its property, tenements, and stock, to the plaintiff. To prove the due execution of this document, the plaintiff relies on the admission of the genuineness of the signature of Pio Pico. This is doubtless presumptive evidence of due execution at the time it bears date. It is but a presumption, however, and may therefore be rebutted by evidence. Neither Pico nor Moreno the secretary whose signature is on the grant, was sworn as a witness, although the latter certifies officially on the grant, that an entry of it had been made in the proper book; and such official statement has been falsified by the fact that no such entry has been found in the proper book, or in any of the records or archives of the government. This grant purports to have been made on the 10th June, 1846, a period near the time when the government of the territory had passed from his (Pico's) hands, and, indeed, during the very heat and conflict of the struggle in which his power was overthrown. Add to this, that this grant never saw the light, so far as the evidence ascertains, until 1848, after the return of Pio Pico to California, from his visit to Mexico; and it is much to be regretted, that the plaintiff has been content to rest solely on the genuineness of the signature of Pio Pico, in a case the circumstances of which render the admonition of the highest judicial tribunal of our country peculiarly impressive, namely, that in such a case careful inquiry and scrutiny is necessary as to the authority of the governor, and the bona-fide exercise of it. U. S. v. Cambuston, 20 How. [61 U. S.] 64.

Now, in this case it is urged, that there are facts elicited by the testimony which disaffirm the presumption arising from the fact of the genuineness of the signature of Pico, and facts independently of the time and the condition of Pio Pico when he exercised the granting power, which show that the grant was made long after its apparent date.

These facts are, that the government archives contain no "espediente" note, or memorandum, of this grant, while there are record-notices of other grants of similar character issued about the same time. That the certificate that an entry of the grant was made in the proper book, is false. That none such has been produced, and its non-production is not satisfactorily accounted for. That the sale of this property itself being public, was at a private sale. That this grant was not only not archived, but its existence unknown to witnesses who, it was to be supposed, must have known of it had it been in existence. That plaintiff in 1848 and 1850 disclaimed by his acts and declarations having any interest in the mission of Santa Barbara. L. T. Burton swears, he was assessor of Santa Barbara county in the latter year, and applied to the plaintiff for a list of his property; that he received a list of particulars from him; that no mention was made of any interest or claim in the mission of Santa Barbara. That in that year the property was not assessed, for the reason that he believed it to be government property. In 1848, I. D. Stephenson was also in an official position, and "received orders to look into the tenures of the mission property, cattle, &c.; was instructed to send a secretary for the documents and titles. I received information that Dr. Den and Mr. Hill (the defendants) were the lessees of the mission in Santa Barbara. The only gentleman I knew of the name of Dr. Den, is the gentleman in court. He was riding by my quarters. I applied to him. He referred me to his brother, as having possession of the mission of Santa Barbara. I went immediately to the mission, saw Den and Hill, received the requisite information, and communicated it to my superior. Dr. Richard Den said he had no interest in the mission, and referred me to his brother." An additional circumstance, which is ascertained by the expediente of Thomas H. Robbins, is invoked, which shows that a portion of the same lands alleged to have been granted to plaintiff, was granted some twenty days after that time, to the said Robbins, with full knowledge by Pico that they belonged to the mission of Santa Barbara. Now, the foregoing circumstances afford intrinsic testimony which create no inconsiderable doubt as to the due execution of the grant, and lead to the conclusion that the grant was ante-dated, and was, in fact, ushered into existence at a much later period than the date it bears, and when any authority which had existed was at an end. This question, as to the valid execution of the deed, was a legitimate issue for a jury; and had this court anticipated this question would have arisen, it would not have assumed the responsibility of a jury in deciding it. The court will not undertake to determine this question, as it proposes to place the disposition of this case, on a ground independent of it. If the decision of the court shall be found to be correct, there is no necessity to decide whether the execution of the grant has been satisfactorily proved. If

deemed to have committed error, the party aggrieved will have an opportunity of explaining the circumstances of this case.

The questions arise, 1st. At the time, and in the position in which Pio Pico was, and in the then condition of the country, did he possess the power to grant the reversionary interest of Mexico in the mission of Santa Barbara, and its live stock, and other personal property? 2d. Apart from the peculiarity of his position, did he, as governor, have the power to sell the personal property, cattle, &c., of a mission?

As to the first question. In the case of U. S. v. Palmer [Case No. 15,989], decided some months since in the district court of the United States, sitting as a land court under the act of 3d March, 1851 (Brightly, U. S. Dig. 111), a grant made by Pio Pico, as governor (and Moreno, the secretary, in this case), came under consideration. In relation to that grant, the court had occasion to discuss the power of Governor Pico to grant anything at the time, and in the position he then held; and as the presiding officer of that court, I had occasion to say, "It must have been with a knowledge that hostilities between the United States and Mexico had commenced on the Rio Grande, that the American squadron was on the coast awaiting orders to take possession of this county, which they did immediately. It was at such a time, and in such a condition of affairs, that Pio Pico undertook to grant" &c. "The condition of things rendered the consummation of the contract impracticable, and practical dominion had passed from Mexico." The court concluded by saying, "that it admitted of great doubt whether on that ground alone the grant should not be deemed invalid." As in that case, however, although the grant was alleged to have been signed by Pio Pico and Moreno, the secretary, as in this, the court was satisfied it was antedated, and declined to decide on the ground of want of authority but predicated their decision on the ground that proof of the execution of the grant had not been made,—so in this case, though strongly impressed with the belief that all practical power to grant, in Pico, if it ever had been vested in him, had ceased to exist, the court will waive the further consideration of it, and proceed to the last view it entertains of this case, and the ground on which it will predicate its decision. Had Pio Pico at any time, as governor, the power to sell or alien the personal property of missions, devoted by law to pious uses, without the intervention of any other department of the government?

In the case of U. S. v. Cambuston, 20 How. [61 U. S.] 64, the court say, that a grant issued under the circumstances which characterize the present, "should be inquired into and scrutinized with great care, as to the authority to make it." In the opinion of the court, it requires little scrutiny to ascertain that no authority existed here. By the laws and regulations of Mexico, whatever may have been the occasional violations of them by unfaithful public agents, the governor had no authority to sell the personal property of the missions, because it belonged to the neophytes, the fruit of whose labor it was. These neophytes, with the fruits of their labor by those laws, were at first placed under the tutelage of the missionary priests; afterwards, under that of the administrators or major domos, appointed by the territorial governors; and then, again, under the administration or curatorship of the missionary priests, to whom the property was restored by Governor Micheltorena, acting under the order of the supreme government. The manifesto of Figueroa gives a history of the laws, —Figueroa, the governor, who, in the estimate of this court (formed from its acquaintance with their transactions), stands pre-eminent among the departmental governors as a faithful and honest public servant. Figueroa's Manifesto, pp. 14, 17–22, 29–32; Figueroa's Regulations; Rockwell, p. 156, arts. 1–10; also, clause 4, art. 23, Alvarado's Regulations; Rockwell, 462, 466, art. 16; Id. 471, 475. Figueroa, in his Manifesto, says (page 31), "Then, and always, the neophytes of the missions were reputed owners of the property pertaining to them; because all was acquired by their personal labor in community under the direction of the missionary friars, who, as tutors, have administered and economized the property remaining, after maintaining, clothing, and supplying the necessaries of the subjected natives, as minors whose education had been committed to them by government."

The foregoing authorities ascertain that the authority exercised by the government over the missions as to their personal property, was as curators of the Indians or neophytes; and that any disposition of that property must be in subordination to their rights. Don Pablo de la Guerra, a witness, says that the governor only exercised control of the property as curator for the Indians; and Alvarado, another witness, deposes that the property was held by the government for the benefit of the Indians and religious services of the missions. Pio Pico, in his grant, has referred to the sources of his authority. He first alludes to the full power with which he was vested by the supreme government to promote the general defense. He next refers specially to a decree of the honorable assembly of the 13th April immediately preceding the date of the grant (1846). He has not given nor has any one else, the specific fountain from which his full powers flowed. The court, therefore, supposes that, for the source it is to look to the general principle which has been enunciated: "that the public acts of public officers, purporting to be exercised in an official capacity, and by public authority, shall not be presumed to be usurped; but that a legitimate authority had been previously conferred, or subsequently

ratified." This principle has been applied to Spanish titles, and was prominently enunciated in the cases of U. S. v. Arredondo, 6 Pet. [31 U. S.] 729; U. S. v. Clarke, 8 Pet. [33 U. S.] 436; and in Delassus v. U. S., 9 Pet. [34 U. S.] 135. The reasons which grew out of the powers of the Spanish monarch, and his vicegerents in the New World, which called for the application of the principle, do not exist in regard to the territorial or departmental governors of California; or the relations which subsisted between them and the government of Mexico. Their power to grant even vacant lands was restricted, and could be legally exercised only when in conformity with the provisions of the colonization decree of 1824, and the regulations of 1828. [U. S. v. Cambuston] 20 How. [61 U. S.] 64. The power of a territorial governor to alienate the cattle and other fruits of the labor, belonging to the neophytes of missions, is not a matter of presumption, particularly in a case like the present, where the circumstances under which it was exercised demand careful scrutiny into the existence of such authority.

We now turn to the second source of power to which Pio Pico refers in his grant (the decree of 13th April, 1846), in conformity with which he states in the grant, he had resolved to make a genuine and effectual sale to Richard S. Den, of the Mission of Santa Barbara, with all its property, tenements, stock, and lands. Now, no such decree has been proved even to have been in existence. It is urged that the date of the 13th April was a mistake, and that the decree intended to be referred to, was that of 3d April, 1846, inserted under that date in Rockwell, 475. Suppose that such inference is correct, an inspection of that decree as set forth by Rockwell, shows no warrant for the action of Pio Pico. That decree on its face shows it could not have been the source of any power in relation to the mission of Santa Barbara. By its first article, it is clear that this mission was not intended to be included. For the purpose of saving from ruin certain missions which could not find tenants who would lease them under the previous efforts made by the government, and were, therefore, falling into decay and ruin, it was decided that the departmental government should act in the manner which may appear best, &c. The mission of Santa Barbara was, therefore, excluded; for it is ascertained from the testimony, it had been rented previously to the defendants, in conformity with the decree of 28th May, and the regulations of 28th October, 1845, and they were in possession of the mission at the time. By the article 3, the decree provides, should government, by virtue of this authority, find that in order to prevent the total ruin which threatens said missions, it will be necessary to sell them to private persons, this shall be done at public auction, the customary notice being previously given. Article 4, provides that in case of sale, if after the debts be paid, any surplus should remain, this shall be divided among the Indians of the premises sold, government taking care to make the most just distribution possible. This legislation exhibits the same spirit which always regulated the Mexican legislation toward the Indian convert. The titles to the lands where the missions were located, were never deemed out of the government; but that the government, in relation to the personal property of the Indians, acquired by their labor and production, acted towards it as curators and guardians, there can be little doubt. When, then, Pio Pico referred to the decree of 13th April, 1846, if he intended to allude to the decree set forth by Rockwell, and stated he was acting in conformity with it, he simply stated that which is disproved.

The court considers it needless to refer in detail to the Montesdioca document, to the proceedings of the departmental assembly of 15th April and 13th of May, 1846, or any other documents to show that the grant was made without authority but in contravention of the orders of the supreme government. Judge Hoffman, in the district court of the United States, sitting as a land court, under the act of 3d of March, 1851 (Brightly, U. S. Dig. 111), in the Case of the Orchard of Santa Clara, has referred in detail to some of the decrees and orders. His opinion has been published, and is easy of access. The conclusion to which the judge came was, "that admitting the governor's right to grant the vacant lands of the missions, or even to sell them, as to which latter I express no opinion, it is nevertheless clear that he had no authority either to grant or sell the vineyards, orchards, &c.; which on the petition of the bishop, had been recognized by the president as belonging to the Fathers, which had been restored to them by Micheltinevo, and the sale of which, under the assembly decree of May 28th, 1845, the supreme government had promptly interposed to prevent." This is the conclusion to which the court came, on the general power of the governor to sell personal property of the mission. In a case, where the sale was private and to private individuals; where the evidence of it professes to have been entered on the records, where no entry on record of the grant is produced, and its non-production not accounted for; where the existence of the grant for some time after its alleged execution was unknown; where the party had, by his act and speech, disaffirmed having any interest in the property; where a portion of the same land alleged to have been granted to the present plaintiff, was granted by the same grantor, with full knowledge that it composed a portion of the mission of Santa Barbara, within twenty days after the time the grant to the plaintiff is alleged to have been made; where the grant was made at a time, and under circumstances which require careful scrutiny, to ascertain the authority of the grantor and the bona fides of its exercise;

and in view of the authorities hereinbefore referred to, as reported in Rockwell, — the court cannot consider the authority of Pio Pico to make the grant, under which plaintiff claims title, as having been established. The court, therefore, acting as a jury, find a verdict in favor of the defendants.